Allen G. EICKMEYER and Marjorie L. Eickmeyer, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 76–1963.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 23, 1978.

Decided Aug. 1, 1978.

A. Glenn Sowders, Jr., Kansas City, Mo., for appellees.

Libero Marinelli, Jr., Tax Div., Dept. of Justice, Washington, D. C. (Myron C. Baum, Acting Asst. Atty. Gen., and Gilbert E. Andrews and Richard W. Perkins, Tax Div., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an appeal by the Commissioner of Internal Revenue from an unfavorable ruling by the United States Tax Court. The Commissioner determined deficiencies in the taxpayer's federal income tax for the years 1968, 1969 and 1970, amounting to $48,143.43, $115,363.38 and $92,842.58. The Tax Court reversed and redetermined the deficiencies in the amounts of $1,666.25 for 1968, $1,633.49 for 1969, and $1,588.74 for 1970.

The question for decision is whether the interests assigned are of such a character so as to be taxed as ordinary income as opposed to capital gains. The income is derived from payments made by unrelated third parties to the taxpayer Allen G. Eickmeyer for use of a patented process.

During the period January 1, 1960 through December 31, 1970, Eickmeyer entered into 12 separate agreements for the use of the so-called Catacarb process, which process was patented and has wide application in the oil refining, petrochemical, and

fertilizer processing industries. The patent was not issued until November 26, 1974, and Eickmeyer is the only record holder of an interest in the several applications that were made and is the only record owner in the patent as well.

During the 1960's, the period mentioned above, Eickmeyer entered into 12 separate agreements, and during the three years in question he received payments pursuant to eight of those agreements.

There were three agreements which were entered into before 1968. Each of these granted the transferee an "exclusive license" in the process. The contracts with Bechtel Corporation and Sun Oil Company defined "exclusive license" as "the sale and transfer of an irrevocable, undivided interest in the complete Catacarb Process and the Patent Rights covering said Process, the size and/or capacity of said interest defined by the purchase price or royalty paid." In the Atlantic Richfield Company contract, the term "exclusive license" was defined as "the sale and transfer of an irrevocable undivided interest to make, use and sell the complete process."

Each of the mentioned contracts transfers the patent rights for ten years or for the life of the patent, whichever is longer. There is no provision in any one of them giving to Eickmeyer any right of termination. Bechtel is authorized to sublicense provided it promptly notifies Eickmeyer and pays to Eickmeyer "all royalties herein provided." There is provision in the Atlantic Richfield agreement which prohibits assignments without Eickmeyer's consent, but does not mention sublicensing. Nor does the Sun Oil agreement have any provision providing for sublicensing or assignment.

There were five other agreements made during the period from 1968 to 1970. Contracting parties were Chemical Construction Corporation, Dawood Hercules Chemicals Limited, J. F. Pritchard & Company, M. W. Kellogg Company and Tenneco Oil Company. Each of these agreements contains a provision purporting to grant "an undivided 1% interest in the Patent Rights." The Dawood Hercules contract grants this interest in Pakistani patents. The Kellogg agreement grants an interest in all United States and foreign patents. The other agreements grant interests in United States patents. With the exception of Dawood Hercules, the agreements all provide for sublicensing or subassignment. The Dawood Hercules agreement has no contrary provision. All except the Tenneco contract authorize Eickmeyer to terminate on default of the transferees. The Kellogg and Pritchard agreements only authorize the transferee to sue for infringement in its own name. All agreements continue during the life of the patent.

Provisions are made in all of the agreements for the payment of royalties measured by the amount of use made of the patent. None of the agreements restricts the rights geographically or according to fields of use, and none of them reserves to Eickmeyer the right to sue for infringement.

The most significant and revealing fact is that which purports to give the assignees of the patent the right to transfer a similar interest to other parties. Coupled with this is the requirement that the compensation measured by the extended use of the patent by these subassignees must flow to Eickmeyer.

The crucial provision of the code, I.R.C. § 1235(a), applicable to the taxable years here in question, provides in essence that a transfer of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months (now 1 year), regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

The area of dispute is whether there has been a transfer of "an undivided interest"

in "all substantial rights" to the patents. The term "undivided interest" is defined in Treas.Reg. § 1235–2(c) (1965) as follows:

A person owns an "undivided interest" in all substantial rights to a patent when he owns the same fractional share of each and every substantial right to the patent. It does not include, for example, a right to the income from a patent, or a license limited geographically, or a license which covers some, but not all, of the valuable claims or uses covered by the patent. A transfer limited in duration by the terms of the instrument to a period less than the remaining life of the patent is not a transfer of an undivided interest in all substantial rights to a patent.

The Treasury Regulation thus considers ownership of the same fractional share of each and every substantial right to the patent to be the important quality of an undivided interest. Excluded is the right to income from a patent or a license limited geographically or right to the income of a license which covers some but not all of the valuable claims or uses covered by the patent.

Although the taxpayer sought capital gain treatment of the royalty income received from all of the above-mentioned assignments, the Commissioner ruled that because he had retained substantial rights in the patent and had not sold undivided interests in it, he was not entitled to such treatment because § 1235 was not applicable.

On the other hand, the Tax Court ruling was that all of the assignments were transfers of undivided interests and that § 1235 applied and operated so as to give the taxpayer capital gain treatment.

We conclude that the Commissioner correctly concluded that Eickmeyer retained significant interest in the patent and that the transfers or assignments here considered do not meet the standards which are set forth in § 1235(a), *supra.*

## I.

■ The starting point is I.R.C. § 1235(a), which sets forth the terms under which there can be a transfer of a patent or an interest in the patent which can be considered the sale or exchange of a capital asset even though the payments are measured by the use of the patent. The fundamental statutory requirement is that there be a transfer "of property consisting of all substantial rights to a patent, or an undivided interest therein *which includes a part of all such rights* " (emphasis supplied). It is fundamental, therefore, that although the percentage of ownership or quantity of ownership need not be the same as that of the transferor, the character of the right of transfer must be the same. Each element in the title must be present in that which is transferred. That is where the interest with which we are here concerned falls short of being taxable as a capital gain.

■ The date of the enactment of § 1235, *supra,* was 1954. Prior to that capital gain treatment was available if it were determined that there had been a sale of all substantial rights in the patent as opposed to a mere licensing arrangement. *See* 3B J. Mertens, *The Law of Federal Income Taxation* §§ 22.133–.134 (1973). That author states that in order to get a capital gain both before § 1235 and thereafter, there must be a sale of an interest in all of the rights which the transferor has in the patent. It must be a sale or exchange of the patent or invention. Mertens further states that a flexible test which has been used by some courts is "whether rights amounting to full and complete control were relinquished." It is, of course, recognized that a sale of the entire patent is not necessary. The quantity or percentage sold is not controlling. *See, e. g., Dairy Queen, Inc. v. Commissioner,* 250 F.2d 503 (10th Cir. 1957). Although *Dairy Queen* was a pre-§ 1235 case, the statute does not alter this principle. The statute was designed to give capital gain treatment regardless of whether payment is measured by use of the property transferred or payable over a period equal to the life of the patent. *See* S.Rep.No. 1622, 83d Cong., 2d Sess., *reprinted in* [1954] *U.S.Code Cong. & Admin.News,* pp. 4621, 4747, 5081–84.

On the issue as to what property a patentee has for purposes of assignment, the Supreme Court in a non-tax case, *Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891), has utilized three kinds of interest which are available:

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d the exclusive right under the patent within and throughout a specified part of the United States.

138 U.S. at 255, 11 S.Ct. at 335.

The opinion of the Court adds the following significant statement:

> Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. Rev.Stat. § 4919; *Gayler v. Wilder,* 10 How. 477, 494, 495 [13 L.Ed. 517]; *Moore v. Marsh,* 7 Wall. 515 [19 L.Ed. 37]. In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice; as where the patentee is the infringer, and cannot sue himself.

138 U.S. at 255, 11 S.Ct. at 335.

■ Granted that *Waterman* is not a tax case, nevertheless, the taxing statute does not seek to change *Waterman's* definition of property interests present in a patent and available for a transfer. Eickmeyer argues that while he has retained the power to create additional interests by making additional assignments, this right is shared with the other transferees, who also have the right to sublicense or subassign. Like Eickmeyer, it is said that they can extend the use of the patent at will. If they, in reality, shared this right, the argument that § 1235 applies to authorize a capital gain

would have some persuasiveness. The right of the transferee here to sublicense or subassign is, however, only an appearance of a right. Analysis shows that even though a transferee were to grant a sublicense or subassignment, he would be doing it only on behalf of Eickmeyer, for in the event of such a transfer the royalties would inevitably be paid to Eickmeyer by either his transferee or the subtransferee. These payments are always measured by the *use* of the patent. If Eickmeyer's transferee were to charge a higher royalty rate, Eickmeyer could license the sublicensees at the lower rate. Thus the presence of this terminology in the agreement is not significant in view of the legal and practical consequences which are mentioned above and this, of course, has to be confronted because substance rather than form prevails. The fact then that each of the contracts *purports* to convey an undivided interest is not controlling. We must consider the consequences which flow from this "undivided interest."

## II.

Also supportive of the conclusion we reach is 35 U.S.C. § 262, which provides that "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use or sell the patented invention without the consent of and without accounting to the other owners." This helps to prove that if the transferee is indeed an owner, he would not have to *account to the other owners.* But here, of course, accounting to the owner is the essential part. Eickmeyer is shown to have retained the all-important right to collect for all uses of the patent whether by the original transferee or subsequent ones. Furthermore, in genuine owner situations each of the owners can grant a license, assign his share of the patent, and sue for infringement or for royalties. *See Willingham v. Star Cutter Co.,* 555 F.2d 1340, 1344 (6th Cir. 1977).

## III.

The practical effect of Eickmeyer's assignment is to grant non-exclusive licenses

to each of the transferees. Each of the transferees remains under the control of Eickmeyer. *Cf. Walen v. United States,* 273 F.2d 599 (1st Cir. 1959), wherein the possibility of selling a partial interest in a patent and obtaining capital gain treatment was recognized prior to the enactment of § 1235. The First Circuit said that "to do so it should be a transfer of a measurable, identifiable share, and not of an undefined one of elastic proportions dependent upon how many subsequent 'shares' the grantor might elect to create." *Id.* at 602 n. 3.

The unlimited power enjoyed by Eickmeyer to create new licenses or owners also serves to reveal the true character of his property interest. By reason of this it differs from *Kavanagh v. Evans,* 188 F.2d 234 (6th Cir. 1951). In that case the transferor of a patent retained only a license together with the right to transfer it to one other person in case he did not exercise the license himself.

\* \* \* \* \* \*

We have one final observation. The assignments by Eickmeyer of purported interests withheld in each instance the right to exclude others from use of the patent. Failure to transfer this also shows that no substantial interest in the patent was granted.

\* \* \* \* \* \*

In summary:

1. The term "undivided interest" contemplates a fractional interest in all of the rights which are part of ownership of the patent.

2. The taxpayer retained the power to create additional interests by making additional assignments and retained the right to payments or royalties based upon use, including not only payments by his assignees or transferees, but also subassignees.

3. The transferees in this instance are not owners because, among other indications, they are accountable to Eickmeyer.

4. Each of the transferees remains under the control of Eickmeyer. These transferees are nothing more than licensees.

Accordingly, Eickmeyer is not entitled to have capital gain treatment for the royalty income.

Accordingly, the judgment of the Tax Court is reversed. The cause is remanded for redetermination of the taxpayer's deficiency consistent with the opinion of this court.